**KIRK MANUFACTURING COMPANY, a corporation, Plaintiff,**

v.

**Robert E. CALDWELL, an individual, and Caldwell Manufacturing Company, a corporation, Defendants.**

Civ. No. 531.

United States District Court
D. Nebraska,
Grand Island Division.

June 17, 1958.

Carter H. Kokjer and Thomas E. Scofield, Kansas City, Mo., for plaintiff.

John P. Jensen, Kenneth H. Dryden, Kearney, Neb., for defendants.

VAN PELT, District Judge.

Plaintiff, a Texas corporation, brings this action against the defendant, Robert E. Caldwell, a resident of Kearney, Nebraska, and the Caldwell Manufacturing company, a corporation incorporated under the laws of the State of Nebraska, charging defendants with infringement of its patent relating to an animal oiling and rubbing device, marketed under the trade name "Old Scratch". Defendant Caldwell, who manufactures and sells a device marketed under the trade name of "Itchit" and which device is used for the same general purposes as plaintiff's, denies infringement and also questions the patentability of plaintiff's device and the validity of plaintiff's patent.

Plaintiff is the holder by assignment of patent number 2,581,028 granted January 1, 1952 to William M. Kirk (see Exhibit 11). Defendant Caldwell was the original holder of patent number 2,706,465 (see Exhibit T) issued April 19, 1955 and patent number 2,785,653 (see Exhibit S) issued March 19, 1957, both of which have been assigned to the Caldwell Manufacturing Company, a Nebraska corporation.

Plaintiff's patent was applied for April 24, 1950. Caldwell's first patent was applied for March 18, 1953 when he was living at Lakin, Kansas; the second on March 11, 1955.

The case comes on for trial upon the issues relating to both validity and infringement. The questions relating to damages, if any, were reserved by the Court for later hearing if then material under the Court's findings.

The testimony supports the finding that William M. Kirk in late 1949 and early 1950 was a cow hand on a Texas ranch; that he worked on a device for applying oil and insecticides to cattle (see Exhibit 25 for picture of an early model). This was followed by another handmade model (see Exhibits 27 and 28) which he showed at the Amarillo Stock Show the week of March 7, 1950. In January or February, 1950 he had had a search made in the patent office and his patent application followed in April as above noted. At the Amarillo Show he made a few sales and within about 30 days thereafter was filling orders. Exhibit 29 is the first advertising folder put out by plaintiff.

Exhibit 21 shows sales by plaintiff of both his cattle and hog oilers. It shows sales in nine months of 1950 of 740 units; in eight months of 1951 of 2,851 units; in the fiscal year ending August 31, 1952 of 3,528 cattle oilers. Since that time the exhibit shows substantial sales altho, except for 1955, declining in number. The gross sales have ranged from a low of $106,130.39 the first year to a peak of $493,675.63. Public acceptance of the Kirk device was shown not only by the sales just mentioned and by items in local newspapers in Texas including an item in the Amarillo Register (Exhibit 13) and in the Houston Chronicle (see Exhibit 15), but also in national magazines (see Time Magazine April 9, 1951, Exhibit 14; Colliers Nov. 22, 1952, Exhibit 13). The Court finds from the evidence that the Kirk device did fill an existing need and has received public acceptance.

Robert E. Caldwell operated a machine shop in Caldwell, Kansas until he moved to Lakin, Kansas in 1945. He moved to Kearney, Nebraska, in 1953 and early 1954. About the middle of 1951 he had worked out a unit relating to an oiling device for cattle and had a search made on it. Later he applied for and received the first of the patents above numbered.

On direct examination Caldwell denied ever seeing a Kirk machine prior to 1953. He testified that he had seen a Cherokee

Rubbin' Post made by Vassar (see Exhibit L), in 1952 and sold some of them while he was working on his device. The evidence supports the finding that in March, 1951 plaintiff established a Mr. Mackey as its dealer in Lakin. He was sold and furnished 14 "Old Scratch" devices on March 6, 1951. The evidence shows that in June, 1951 Kirk called Caldwell on the telephone. After that conversation Caldwell went to Mackey's store to see the "Old Scratch" unit. A few days before, when driving down the street, he saw a machine there but hadn't looked it over and didn't know who made it. The time of the telephone conversation becomes important because Mr. Caldwell maintains that it was in 1952. Mr. Kirk testifies that he closed Mackey out as an agent in 1951. It is the Court's belief from all the evidence, and the Court finds, that Mr. Caldwell examined an "Old Scratch" machine in 1951 and prior to the time of filing the application on which his first patent was based.

In Caldwell's first device he used washers and not a coil spring on the catenary and had a diaphragm pump at the bottom of the reservoir rather than in its present location. The evidence is in conflict on whether Caldwell sold any devices using washers rather than the coil spring. On cross-examination he was asked:

"Q. Did you ever sell any with the washers? A. Not to my knowledge, sir. There could or could not be. I don't know for sure." (R. 310)

His deposition was then used for impeachment purposes:

"Q. 'Answer: The ones we sold was a steel washer.

" 'Question: That is, with the circular shape? Answer: Yes, sir.

" 'Question: And how long did you sell those? Answer: Until November or December of 1951.

" 'Question: And when did you start selling them, about as best as you can recollect? Answer: I would say April.

" 'Question: From April to November of 1951 or December? Answer: Yes, sir.' " (R. pp. 311, 312)

The Court finds that the first machines sold by the defendant used washers on the catenary.

### Infringement

Does Caldwell's device infringe the Kirk patent? In discussing this point the Court should perhaps first review the law on the subject.

The United States Supreme Court has said:

" * * * generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930." Sanitary Refrigerator Company v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147.

More recently the Court has not only in effect re-examined and approved the Refrigerator Company case but has outlined the path for a trial judge to follow:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it. But the courts have

also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 855, 94 L.Ed. 1097, 1099, 1101–1102.

■ Judge Parker, speaking for the Court of Appeals for the Fourth Circuit, in Oates v. Camp, 83 F.2d 111, 115, said

"Certainly one who * * * takes the heart of an invention cannot escape liability for infringement by such slight changes in form and such use of obvious equivalents. As was said by Mr. Justice Curtis speaking for the Supreme Court in Winans v. Denmead, 15 How. 330, 342, 14 L.Ed. 717:

" 'It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to question; and the property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; I have not taken that, and so have not infringed. The answer is, my improvement did not consist in a change of form, but in the new employment of principles or powers, in a new mode of operation, embodied in a form by means of which a new or better result is produced; it was this which constituted my invention; this you have copied, changing only the form.' "

In the Eighth Circuit, it was said in Montgomery Ward & Co. v. Clair, 123 F. 2d 878, 881, in laying out the pattern to be followed in determining infringement:

"It is settled that 'to sustain the charge of infringement the infringing device must be substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and cooperate to produce that result. If the devices are substantially different in either of these respects the charge of infringement is not sustained.' "

Let us first examine the Caldwell device as to the result attained. Manifestly, as is demonstrated by the examination of the models which were put in evidence and which the Court had an opportunity to examine in the hallway adjacent to the courtroom (see Exhibits Z and AA), the result attained by each is the same. A reading of the brochures produced by the parties for sales purposes also establishes this fact. Plaintiff claims:

"Old Scratch doesn't just doctor the back—Old Scratch puts the insecticide and oil where the itch and irritation is, whether it be on the back, belly, crotch, or tail root. When Old Scratch is conveniently placed at the watering hole the cows will take care of themselves, because they know where they itch." (Exhibit 20.)

Defendant Caldwell claims:

"The Itchit cattle oiler gives the animals a place where they can do something about the spot that itches. It is so constructed that they can rub their back, belly, between their legs or the root of the tail and the butt of the horns * * * anywhere they desire and get an even, soothing application of oil mixed with an effective insecticide." (Exhibit 5.)

The products are not exactly identical in appearance but they are similar. Each is portable. Each has a sizeable oil reservoir. The height is substantially the same. The reservoir on each is mounted on steel pipe. Each employs a steel cable as a catenary. On one we have washers strung on the cable; on the other a coil spring. The oil runs down or along the cable on each and reaches the cattle when they rub on this catenary. It is clear to the Court that the result attained by the two devices is the same.

It requires a detailed comparison and description of the two devices to determine whether "Itchit" infringes an "Old Scratch" in the means of attaining the result and in the manner in which the different parts operate and co-operate to produce the result obtained by each. Therefore, the Court will discuss together Items 2 and 3 mentioned in the Montgomery Ward case.

The oil in both devices is in the bottom of the reservoir. It has to be lifted from the reservoir to reach the cable. Kirk employs a chain to bring the oil from the bottom to the top. This method of raising liquid goes back to the days of Ptolemy, and irrigation in the Nile valley. Caldwell uses a pump which originally he put at the bottom of his reservoir and now has toward the top. In his first model he used an old Chevrolet water pump. Whether the pump is an improvement over the chain and patentable as an improvement on Kirk, is not before the Court.

It was developed in the pretrial conference that plaintiff was dropping claim number 15 and would rely only upon claims numbered 1, 7, 11, 17 and 19 of its patent.

The Court will take up each claim and will examine first claim number 17 (see Exhibit 9). Defendant Caldwell admits that elements (a), (b) and (e) of claim numbered 17 are found in his machine (R. 282). Defendants' position as to claims numbered 17 and 19 is stated in their brief:

"As to claims 17 and 19 of the plaintiff, the defendant denies infringement in that,

"(a) the reservoir is not invention,

"(b) the cables used for rubbing element are not invention, and

"(c) that the defendant's device has no endless chain, or equivalent thereto, to raise the liquid, but uses a pump operating on an entirely different principle, adapted to an entirely different range of liquids and not dependent upon density of the liquids or its adhesive qualities, and which operates with equal efficiency in all temperatures, and not being an equivalent,

"(d) the defendant's device has no 'nipple' or flow-way but uses a pipe, washer, or nozzle, (used in synonymous sense) with an entirely different function as will be pointed out later,

"(e) the platform used for convenience in moving the device and making it portable is not an invention,

"(f) the overflow reservoir in the pipes at the base in plaintiff's patent has now been abandoned and *was never used by the defendant,* and

"(g) the increasing of tension on the cable to operate the lever at the top of the tank is not invention.

"Generally, the defendant contends that the defendant's arrangement, which the plaintiff claims infringes, is different in operation, in function, and in result."

Since it is admitted Caldwell has (a) and (b), we next examine to see if he has a (c).

Item (c) of Claim 17, reads:

"(c) means including an upwardly and downwardly movable element in said support to supply oil from the reservoir to the upper end of said rubbing element upon downward movement of said movable element,".

Defendant Caldwell testified as to item (c):

"First, in item (c) we have no upwardly and downwardly movable element". (R. 281.)

The function of the movement described in item (c), supra, of Kirk, and which is operative by the pressure on the rubbing element, is to supply oil to the upper end of the cable. In Caldwell the rubbing element is so attached at the upper end of the device that pressure on the rubbing element causes the pump actuating arms (34 and 34′) to move, as Caldwell would term it, sideways, or it might be termed forward and backward, there being a spring that returns the arm to its original position when the pressure is relieved. The Court is confronted with the question whether if a means in Caldwell serving the same purpose as is served in Kirk operates sideways rather than up and down, it absolves Caldwell from infringement. This Court does not so understand the law and concludes that direction of operation alone is not a sufficient difference between the two devices to relieve defendants if otherwise liable. Plaintiff claims that its lever (66 on the original patent, Exhibit 11) moves about as much inwardly and outwardly as it does up and down. There is truth to this claim but the Court does not rely upon that fact alone. As said by plaintiff:

"The fact of the matter is that the function performed by the pump lever arm of Caldwell is exactly the same as that performed by the arm 66 of Kirk. Both actuate an oil feed means to cause delivery of oil to the upper end of a rubbing element when the rubbing element is distorted due to contact with an animal."

The Court therefore concludes that defendants have a means similar to claim 17(c). The fact that the movable element moves sideways rather than upward and down does not avoid infringement.

Claim 17(d) reads:

"(d) Means connecting the upper end of said rubbing element to said upwardly and downwardly movable element".

Each has a means of connecting the upper end of the rubbing element to the movable element. The Court's observations as to element (c) apply to the upwardly and downwardly movement here again mentioned. Caldwell has a means which the Court believes serves the purpose of claim 17(d).

Claim 17(f) reads:

"(f) Means for yieldably raising said upwardly and downwardly movable element to an upper position and disposing said rubbing element in the shape of a catenary, in their normal condition, whereby gravity flow of the oil along the rubbing element will occur upon downward movement of the upper end portion of the rubbing element and said upwardly and downwardly movable element, incident to an animal distorting the rubbing element from its normal condition by rubbing engagement therewith, at any position with respect thereto;".

Caldwell testified about this claim in addition to his claim that he did not have an upward and downward motion, as follows:

"* * * in part (f) we don't have any upwardly or downwardly movable element again, so there is no upper position to raise it into by application of the rubbing element." (R. 281.)

The Court does not regard this claimed distinction as a real difference, and believes, as above indicated, that the functions of (c), (d) and (f) are infringed.

We next turn to claim number 19. Elements (b), (c), (f) and (g) of 19 are identical in language with (b) (c), (e) and (f) of 17, respectively.

Caldwell was asked relative to claim 19 and testified:

"Q. Now I ask you, is the function performed by the cable manipulation, the pump actuating arms, and the fluid pumps of the Caldwell device the equivalent of the elements as set forth in claim 19, elements (c), (d), and (e)? A. No, sir.

"Q. And why? A. Because, number one, we don't have any part of portion (d) in the Caldwell machine, and in part (c), there is no upwardly or downwardly movable element in the unit; and, part (e), we can't connect it to any upwardly and downwardly movable element when there is none present." (R. 285.)

The Court's reasoning and finding above set forth, as to the upward and downward movement applies to 19 in the same manner as to 17. Therefore, except as to the cylindrical nipple mentioned in (d) and (e) of 19, if the Court's reasoning as to 17 is correct, there is also infringement in 19 unless the claimed absence of the cylindrical nipple absolves defendants. It is not argued that Caldwell does not have an oil supply reservoir (see Kirk 19A) and in fact Caldwell does have it in the same general position and of the same general construction.

Kirk has a cylindrical nipple through which the oil flows before reaching the cable. It is referred to in column 5 of the patent, lines 5 to 9 and is shown in figures 2 and 4 of the patent.

Caldwell does not have a nipple but does have a tubular guide. (See 64, figures 2, 3 and 4 of the April 19, 1955 patent, Exhibit T.) The tubular guide is referred to in columns 3 and 4 of the first patent, including the statement that the liquid medium then runs through the tubular guide (64) and downwardly the cable (see lines 29 and 30, column 4). This same guide is shown in figures 2, 3,

4 and 7 of the March 19, 1957 patent and is referred to in lines 64 to 68 inclusive of column 4, Exhibit S.

That the liquid runs through the collar (71 in Kirk) which the Court finds serves the same purpose as number 64 in Caldwell, is shown in column 6, lines 27 to 33 inclusive, which read:

"The operator may also initially pour a volume of the medium B upon the bottom walls 51 so it will flow along the downwardly extending flow ways 50, then through the opening 55, nozzle 71, coupling 72, along the member 70 and around and over the members 80."

In his brief, Caldwell states:

"The 'nipple' or cylinder is made larger than the cable so that the insecticide may flow through with the cable. The 'nipple' is not a coupling, but more properly a conduit for both the cable and the oil containing the medicinal qualities." (Page 2.)

This Court believes that the Caldwell tubular guide and the collar in Kirk, are identical in purpose and that in each case it is a flow-way or a flow-way aqueduct for oil in its reaching the rubbing element.

Caldwell testifies relative to claim 7: "We don't have a flow way". Defendant Caldwell argues:

"As to (e), it is defendant's contention that the defendant's device does not have a 'flow-way' in the sense used by the plaintiff, and that the arrangement of the elements differs in operation, in function, and in result. This was easily demonstrated at the trial."

The Court reaches an opposite conclusion. Kirk claims a flow-way (50) with a bottom wall (51) which leads to the opening (55) in the wall (54) from which projects the collar (71) which, as above stated, the Court believes serves the same purpose of 64 in Caldwell. A flow-way serves as a guide for the liquid. As hereafter shown, Caldwell refers to collar 64, as "tubular guides" for the liquid medium. It is true that oil gets

onto the cable in the first instance in Caldwell by direct pumping through 45 and 46 known as discharge pipes (See line 40, column 4, Exhibit S; see also 64 and 65, column 4, Exhibit S). In fact it is said in Caldwell:

"* * * the lower end of the arm moves the pump lever 44 to pump liquid medium upwardly through the respective discharge tube and discharge same on the respective cable. The liquid medium then runs through the tubular guide 64 and downwardly on the cable and into the rubbing member 70, the liquid medium slowly feeding by gravity through the coils of said rubbing member."

In the first patent, Exhibit T, this language is used:

"* * * the discharge of the liquid medium preferably being upwardly of the cable relative to the tubular guides 64 where by the liquid medium will run through the guides and down the cables and rubbing members when the flexible operating portions 4 are moved by livestock rubbing thereon."

identical language is used in the second patent.

Caldwell may or may not be an improvement or betterment of Kirk as to this feature. He still pre-empts the important feature of Kirk and the absence of the flow-way such as is described in Kirk, or the use of discharge tubes by Caldwell, does not in the Court's opinion avert infringement.

This discussion has already taken us to a consideration of claim 7. It is a fair reading of defendant Caldwell's testimony when examined as to Exhibit 10, to say that defendant Caldwell admits that the Caldwell machine has elements (a), (b), (c), (d) and (e) of claim 7. Defendant Caldwell's answer as to element (c) was "we have a flexible guy wire, yes, sir."

Defendants' brief relating to claim 7 says:

"For convenience, we again use the order of the description of Claim 7 taken from plaintiff's brief, this time at page 13.

"(a) A horizontal base having an outermost portion.

"(b) An upright tank.

"(c) The loosely hung cable from the top of the tank to the edge of the base.

"(d) The means of securing the cable to the tank.

"(e) The flow-way.

"(f) The endless chain liquid raising device.

"To this the defendant contends that the items of (a), (b), (c) and (d), are not subjects of invention. * * *

"As to (f), it is the means of raising the liquid and the defendant contends that the means used in his device is different in theory, in operation, and in result." (Pages 3 and 4, defendants' brief.)

We have above quoted a paragraph of defendants' brief relative to the flow-way. It is thus evident that defendants do not dispute having an element similar to 7 (c). The flow-way has been considered under claims 17 and 19. While Caldwell does not have a flow-way such as 50 and 51 in Kirk, defendants' 64 serves the purpose of the collar (71) of Kirk and the Court concludes, as above set forth, that infringement is not averted.

We have indicated above, but repeat, that infringement is not avoided by the substitution of equivalents, whether the equivalent is verbally within the claim or not. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

The Court agrees with plaintiff that 7 (f) relates to the means of discharging oil from the reservoir and does not of necessity limit plaintiff to the endless chain device which as earlier indicated, may not be the subject of invention but when taken in combination with the

other elements of Kirk, produces an article on which he is entitled to protection as an inventor. It was said by the Court of Appeals for the Sixth Circuit, in a much cited case:

"Patentable difference does not of itself tend to negative infringement." See Herman v. Youngstown Car Mfg. Co., 191 F. 579, 585.

Our own Court of Appeals for the Eighth Circuit has said:

" 'An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so most patents would be of little worth. * * * The invention, of course, must be described and the mode of putting it to practical use, but the claims measure the invention. They may be explained and illustrated by the description.' Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 418, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122." G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 115 F.2d 958, 962.

The Court concludes that claim 7 is infringed.

We are next concerned with claims 1 and 11. The claims are set forth on Exhibit 8. Defendant Caldwell's testimony shows his device has elements (a), (b), (c) and (d) of claims 1 and 11. While the record shows that he answered (see pages 278, Record) that he had an element (f), almost immediately he stated that he did not have an (f) and the Court believes his answer was inadvertent because he has maintained the position throughout that he does not have a flowway. This contention has been considered above, and the Court has ruled against defendants and therefore the Court finds that Caldwell has an element such as claimed in 1(f), to wit:

"(f) means for flowing oil onto said said elongated member." Claim 1(e) reads:

"(e) a plurality of perforated members strung along said elongated member, each perforated member having an oil-film receiving outer face and opposite oil film-receiving end faces;".

Claim 11(e) reads:

"(e) a plurality of perforated members, having exposed rubbing surfaces strung loosely upon said elongated member."

It is to be observed that plaintiff strings perforated washers along its cable or catenary. Caldwell now uses a flexible coil or spring described as a helical coil. In explaining his invention, he says:

"In the illustrated structure the rubbing members 70 are helical coil springs or the like which preferably extend from the cable clamp 68 to adjacent the tubular guides 64, however, a plurality of coil springs or the like helical members may be strung along the cables 65. The inside diameter of the rubbing members 70 is preferably larger than the cable whereby said rubbing members are free to rotate around said cables. Also the individual coils are spaced to permit the hair of an animal to extend therebetween."

This same language is used in the earlier patent. There is testimony which has been above quoted to the effect that in the beginning Caldwell experimented with washers. Caldwell also claims that he does not have a reservoir such as Kirk claims is provided by the washers. It appears to the Court, however, that the coil also acts as a reservoir but to a considerably lesser degree than the washers. In other words, in the operation of the Caldwell machine some oil flows down the cable and remains on the coil. It is true that a greater amount of oil remains in between the washers. It is Caldwell's contention also that a coil serves to separate the hair, bring the hair against the cable and cause a transfer of oil on the cable, rather than on the coil of Caldwell or on the washers in Kirk. Witness Eastman testified to the contrary and the Court is not persuaded from examining the model, exhibit AA, that some oil is

not transferred from the coil. It seems to the Court that it amounts to the substitution of a mechanical equivalent and the Court must look through the substitution to see whether the inventive idea of Kirk has been appropriated. It believes that it has. The Court does not overlook the fact that the coil may be an improvement, but it still does not avoid infringement and the Court so holds.

### Validity

Defendants' claim as to non-validity is well and briefly stated in their brief.

> "The defendant claims that the Kirk patent is for a combination of formerly known parts for the purpose of supplying medical treatment to cattle. This combination, no element of which is unique, is made up of various elements from devices used on farms and ranches, and various elements used in other medical applicators for livestock." (Page 7, defendants' brief.)

Continuing, defendants argue that the "flexibal" rubbing element would attain the same result as Kirk attains if medicine was introduced onto the cable; that the catenary is not new and is in substance the same as barbed wire attached at each end to posts; that the endless chain as a method of raising liquid is old and is not the subject of patents; that the central tank for liquid is not invention and, they contend, citing Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162:

> "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different functions or operation than that theretofore performed or produced by them, is not patentable invention."

With this and other similar general statements, the Court is not in disagreement. The mere fact, however, that all of the elements of Kirk's combination were old does not show lack of invention nor keep his device from being patentable.

The Circuit Court of Appeals for the Eighth Circuit in the case of G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 115 F.2d 958, in an opinion by Judge Sanborn, stated:

> "It is safe to say that, prior to Packwood, no patent domestic or foreign, shown by the record, disclosed his combination or anything closely approaching it. There is no evidence that any of the combinations of the prior art successfully dispensed soap, which, after all, is the main purpose of a soap dispenser. The evidence indicates that Packwood's dispenser successfully dispenses, and continues to dispense soap. While his contribution to the art was not that of a pioneer, the fact that all of the elements of his combination were old and that each had been used separately before in some device, does not show lack of invention nor limit him so strictly to his peculiar structure as to destroy the worth of his patent. Rudimentary experiments with isolated elements of a combination do not anticipate or discredit invention. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 255, 8 S.Ct. 122, 31 L.Ed. 141; Smith v. Snow, 294 U.S. 1, 17, 55 S.Ct. 279, 79 L.Ed. 721; 'It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor.' Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034, 115 F.2d 964."

It is also to be remembered that defendants applied for and received a patent on their machine. This is an indication that they then regarded such a device as patentable. To paraphrase Judge Sanborn in the Packwood case,

this is in the nature of a concession that Kirk had made an advance in the art which possessed both novelty and utility. This Court therefore believes, again using the language of Judge Sanborn "the defendants are in a poor position to urge want of invention". Other Circuits have recognized this principle. See Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794; France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605; Cover v. Chicago Eye Shield Co., 7 Cir., 111 F.2d 854.

■■ In considering validity it must also be remembered that an issued patent is presumed to be valid. See 35 U.S.C.A. § 282. The burden of proving invalidity is upon the party claiming it. See Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. This last cited case is also authority for the proposition that the presumption of validity is not to be overthrown except by clear and cogent evidence.

The Court feels that the language of Judge Vogel in the recent case of Long v. Arkansas Foundry Co., 8 Cir., 247 F.2d 366, 369, is appropriate.

"It is apparent that the trial court misconceived the law relative to the patentability of a combination of old elements.

" 'A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or non-composite instrument.'

"Leeds & Catlin Co. v. Victor Talking Machine Co., 1909, 213 U.S. 325, 332, 29 S.Ct. 503, 505, 53 L.Ed. 816 (limited on other grounds by Mercoid Corporation v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376).

"In Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 443, 31 S.Ct. 444, 451, 55 L.Ed. 527, the court said:

" ' * * * the elements of a combination may be all old. In making a combination the inventor has the whole field of mechanics to draw from.'

"The applicable rules of law for determining whether a combination of old elements, even if new and useful, rises to the dignity of patentable invention have been fully stated by the late Mr. Justice Jackson in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 151, 153, 71 S.Ct. 127, 95 L.Ed. 162." 247 F.2d 369, 370.

The fact that some or all of the elements of Kirk were old does not change the fact that he produced something both new and useful.

Referring again to the Packwood case, supra, we find the Court quoting from Trane Co. v. Nash Engineering Co., 1 Cir., 25 F.2d 267, 269, as follows:

" 'An invention is a real thing; a patent is the description of it in words and/or drawings. McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800. The description must be reasonably adequate, in order to warn the public and competitors of the nature and extent of the monopoly claimed. But the essence of the matter is a new and useful reality, frequently best tested and demonstrated by actual experience.' "

The Trane case uses further language applicable here:

" * * * and also emphasize the essence of the real invention, viz. a delicate combination of old elements to produce this new, and long-sought, useful result. Jennings successfully established a new functional relationship between the old constituent elements of his combination. Cf. Roberts, Patentability, p. 47." 25 F.2d 269.

The Court believes from the testimony that Kirk put together in operable form

a new and useful reality. It has withstood the test of actual usage and experiment and he should be protected in the claims his patent discloses.

 It is the Court's conclusion that Kirk's patent is valid and that the defendants have infringed it so far as claims numbered 1, 7, 11, 17 and 19 are concerned.

This memorandum will stand as the Court's findings of fact and conclusions of law. However, it will not have the effect of a judgment. Counsel for plaintiff will prepare and submit to the Court an appropriate order consistent with the findings of fact and conclusions of law herein contained, first submitting the order to attorneys for defendants for approval as to form and such order, or one prepared by the Court if the parties cannot agree upon the form, will then be signed and filed and will constitute the appealable order herein.