**GREAT LAKES PIPE LINE COMPANY,**
a corporation, Plaintiff,

v.

The **UNITED STATES** of America,
Defendant.

Civ. A. No. 12705–4.

United States District Court
W. D. Missouri, W. D.

March 21, 1963.

Swanson, Midgley, Jones, Blackmar & Eager, by Ralph M. Jones, Kansas City, Mo., for plaintiff.

F. Russell Millin, by Calvin Hamilton, First Asst. U. S. Atty., Kansas City, Mo., for defendant.

BECKER, District Judge.

This is an action to recover Federal excise taxes in the sum of $340,461.05 and interest thereon brought by an operator of an interstate pipeline company in the business of transporting petroleum products. The taxes were collected during the period between July 1, 1953, and July 1, 1957 inclusive, under the provisions of Section 3460 of the Internal Revenue Code of 1939 and Section 4281 of the Internal Revenue Code of 1954. These taxing statutes are substantially identical in wording, which is as follows:

"There is hereby imposed upon all transportation of crude petroleum and liquid products thereof by pipeline a tax equivalent to 4½ percent of the amount paid for such transportation. If no charge for transportation is made (either by reason of ownership of the commodity transported or for any other reason), or if the payment for transportation is less than the fair charge therefor (other than in the case of an arm's length transaction), such tax shall be imposed on the fair charge for such transportation. The tax imposed by this section is to be paid

by the person furnishing such transportation."

The point at issue is a very narrow one, but one not wholly free of difficulty. The defendant claims that it properly collected the taxes in question under the statutes quoted above, providing for a tax equivalent to 4½ percent of the amount paid for transportation of crude petroleum, and liquid products thereof, by pipeline.

The plaintiff claims that the taxes in question were unlawfully collected because the transaction which was taxed is exempted under the first sentence of Section 4283 of Title 26 U.S.C.A., which reads as follows:

> "For the purposes of section 4281, the term 'transportation' shall not include any movement through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant, *if such movement is not a continuation of a taxable transportation.*" (Emphasis added.)

Section 3460(c) of the 1939 I.R.C. is identical in substance.

In the stipulation of fact, upon which this cause was originally submitted, it was agreed in Paragraph 43 thereof as follows:

> "The plaintiff received a flat five cents (5¢) per barrel for billing and loading tank trucks and tank cars and this flat rate of five cents (5¢) per barrel was in addition to the transportation rate which the shipper paid and which varies with the distance between the refinery originating point and the various terminal destination storage points."

It was further agreed therein that by letter ruling of June 1, 1949, the Commissioner of Internal Revenue allocated one-half of the five cents (5¢) per barrel charge for billing and loading tank trucks and cars to the clerical work in filling out bills of lading (not subject to tax on transportation of oil by pipeline), and one-half to the loading process. The one-half allocated to the loading process was subjected to tax at the rate of 4½ per cent under Title 28 U.S.C.A. § 4281,

and the earlier sections of the I.R.C. of 1939.

In defense of this action to recover the tax, the defendant asserts that the loading service in question is a "continuation of the taxable transportation" within the meaning of Title 28 U.S.C.A. § 4283 and the earlier identical section, Section 3460(c) of the 1939 Internal Revenue Code. At the outset it should be noted that in an action of this nature for the recovery of taxes allegedly illegally assessed and collected, the determination made by the Commissioner of Internal Revenue is presumptively correct, and that the plaintiff has the burden of proving all facts necessary to establish the illegality of the collection. Helvering v. Taylor, 293 U.S. 507, l. c. 515, 55 S.Ct. 287, 290, 79 L.Ed. 623; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, l. c. 294, 55 S.Ct. 158, 161, 79 L.Ed. 367; Welch v. Helvering, 290 U.S. 111, l. c. 115, 54 S.Ct. 8, 9, 78 L.Ed. 212; Niles Bement Pond Co. v. United States, 281 U.S. 357, l. c. 361, 50 S.Ct. 251, 252, 74 L.Ed. 901.

The facts must be determined from the stipulation of agreed statement of facts and the subsequently introduced evidence received at a hearing ordered by the Court on October 8, 1962, because of references by the Government to a published tariff of the plaintiff which was not identified or referred to in the stipulation of fact. Because of this extra-record reference and because of the desire of the Court to secure additional information concerning the exact nature of the operations which the billing and loading charge of five cents per barrel was intended to cover, the original submission was set aside and oral and documentary evidence was received at a formal hearing.

### STIPULATION OF FACTS

The facts which were agreed upon in the stipulation and which are accepted by both parties and the Court are as follows:

"1. During the period here in question, and insofar as applicable here, the

plaintiff was in the business of transportation by pipe line of various grades of gasoline, distillate, and other refined petroleum products from refineries located principally within the states of Oklahoma and Kansas to terminal destination storage points on its system located within the states of Kansas, Nebraska, South Dakota, North Dakota, Iowa, Minnesota, and Illinois, or to connecting pipe line carriers for further transportation by such connecting carriers by pipe line. (Exhibit B—System Map)

"2. During the period here in question, the plaintiff owned and operated fifteen pipe line storage terminals connected to its pipe line system, located in the states listed in paragraph 1 hereof. Plaintiff also delivered refined petroleum products through metering stations into storage terminals owned by certain shippers. (Exhibit B—System Map)

"3. The fifteen storage terminals referred to in paragraph 2 hereof are owned by plaintiff in fee and, for purposes of the issue herein, each constitutes a single tract of land upon which all structures, tankage, piping, and equipment are located, and all terminal operations herein considered occur within the premises of each storage terminal.

"4. Petroleum products delivered to connecting pipe line carriers for further transportation or delivered through metering stations into storage tanks owned by certain shippers and connected to the plaintiff's system do not require billing and loading by plaintiff, and thus are not directly involved in the issue in this case.

"5. At the refinery, the originating shipper consigns to one or more of the terminal storage destination points on the plaintiff's system, and not beyond. (Exhibit C—Form 274 M, Notice of Shipment, and Exhibit D—Form 1, Receipt for Shipment)

"6. The Notice of Shipment and Receipt for Shipment are the only shipping papers. There are no through bills of lading issued by the originating shipper for transportation beyond the terminal destination storage point specified in these documents.

"7. The minimum quantity of a particular product which will be accepted for transportation from the refinery, in single tenders or combinations of tenders, is normally 25,000 barrels (1,050,000 gallons).

"8. The only transportation intent of the originating shipper is to maintain a supply of petroleum products at the terminal storage points adequate to meet its market demands.

"9. No sale of a specific shipment (e. g. 25,000 barrels) of a petroleum product to a customer at a point beyond the terminal destination storage point is identified at the originating point.

"10. The movement of the various grades and kinds of products through the trunk lines from the refineries to the consigned terminal destination storage points are controlled by the dispatchers in the General Office of the plaintiff at Kansas City, Missouri. This movement is performed by main line engines exceeding 1000 h. p. in capacity. (Exhibits E and E1—Photographs)

"11. Shipments through the pipe line system from originating points are commingled in transit with loss of identity of ownership, as petroleum products are fungible.

"12. No storage tank at terminal destination points owned by plaintiff is assigned to any shipper or consignee, as petroleum products are fungible and identity of ownership is lost in transit.

"13. At the destination terminal storage point, the particular kind and grade of product arriving through a trunk line is routed through terminal piping into storage in a tank with similar product.

"14. The product in any given tank may have arrived through separate trunk lines from different originating points.

"15. Storage tanks at the terminal storage destination points each vary in size up to 80,000 barrels, or 3,360,000 gallons, in capacity.

"16. The storage tanks are equipped with devices for circulating the contents

from time to time to maintain a uniform and proper blend, color, and grade of product to enable the consignees to meet state specifications and market requirements. This is performed by a low pressure one-stage pump, varying in capacity from 30 h. p. to 75 h. p., located at each storage tank. (Exhibit F—Photograph)

"17. A consignment made by a shipper to a terminal destination point may remain in storage tanks for an indefinite period, varying from a few days to several months, depending on the market demands of the various consignees marketing the particular products.

"18. The low pressure one-stage tank pumps are also used to move products through terminal piping from one storage tank to another for consolidation of products of the same kind and grade and for mixing and blending.

"19. The low pressure one-stage tank pumps are also used to move products from storage tanks to the truck loading rack and to the railroad tank car loading rack, through terminal piping. (Exhibits G and H—Photographs)

"20. The movements from one tank to another or from the tanks to the loading racks are controlled locally by each terminal superintendent and not by the dispatchers at Kansas City who control the trunk line movements from originating refineries to terminal destination storage points.

"21. Basic kinds and grades of petroleum products are converted into additional grades to meet the market requirements of those shipping from the terminal storage. Conversion is accomplished by mixing and blending of products and by adding materials, such as identifying color, lubricants, solvents, and other additives. Each terminal is equipped to deliver 17 or more kinds and grades of petroleum products as required by the shippers to meet their market demands.

"22. When a consignee or his authorized agents and customers desire to withdraw products, the consignee, agent, or customer prepares a Tank Car Loading Order (Exhibit I—Form 293) or a Truck Loading Order (Exhibit J—Form 281).

"23. Tank cars and tank trucks are supplied by the consignees or their authorized agents and customers.

"24. The drawer of the Tank Car Loading Order mails or delivers the Order to the particular terminal point where product available to him is in storage.

"25. The Loading Order is plaintiff's authority to release from storage a designated quantity of the kind and grade of product specified thereon for transportation by tank car to a specific consignee at a specific destination.

"26. After the signature on the Order is verified against the Signature Card (Exhibit K—Form 290) on file in the terminal office, the railroad tank car supplied by drawer of Order is loaded by terminal personnel.

"27. The operation of loading a railroad tank car involves no more than the insertion of a spout, temporarily attached to the loading rack line currently handling the grade and type of product specified on the Loading Order, into the tank car, and the pressing of a button which starts the low pressure one-stage electric pump at a storage tank containing the product ordered. (Exhibit L—Valve Chart)

"28. After the tank car is loaded, a railroad Straight Bill of Lading (Exhibit N—Form 300) is prepared by a terminal office clerk, showing that terminal storage point as the origin of the shipment, and specifying thereon the destination, consignee, and route, in accordance with the Loading Order instructions.

"29. This Form 300 is signed by terminal personnel, acting for the shipper, and by a representative of the railroad handling the tank car.

"30. A copy of the railroad bill of lading is retained by the plaintiff as a receipt for products released from storage, and the other copies are distributed to the railroad, shipper, consignee, etc.

"31. When a truck driver comes to the terminal office building with a Truck Loading Order, the signature thereon is

also checked against the authorized signatures on file in order to ascertain that the withdrawal Order is properly authorized.

"32. This Loading Order is plaintiff's authority, if properly signed, to release from storage a designated quantity of the kind and grade of product specified thereon for transportation by tank truck to a specific consignee at a specific destination.

"33. From the 'Instructions for Loading and Completing Bill of Lading' on the Truck Loading Order (Form 281), a terminal office clerk prepares a combination 'Truck Order and Receipt' and 'Bill of Lading'. (Exhibit N—Form 279)

"34. The truck driver proceeds to the truck loading rack where the tank truck compartments are loaded in accordance with the Loading Order instructions.

"35. The operation of loading a truck at the loading rack also involves no more than the insertion of a spout, temporarily attached to the loading line currently handling the kind and grade of product specified on the Loading Order, into compartments of the truck, setting the meter to measure the required volume, and pressing a button which starts a low pressure one-stage electric pump at a storage tank containing the required product.

"36. When the required quantity is delivered into a compartment, the meter through which the product flows automatically shuts off the tank pump.

"37. If the Truck Loading Order provides for the injection of additives furnished by the various shippers, the loader also presses a button which will cause the proper amount of additive to be injected into the stream as it flows through the meter and into the tank truck compartment during the process of loading various grades of gasoline.

"38. The shippers also furnish and own the equipment for injecting their additives into the various grades of gasoline. This is provided in the tariff.

"39. When the compartments are filled with the type and grade of products as authorized, including additives, (different types and grades of product may be put in different compartments), the driver returns to the terminal office where he receipts for the load and is given a copy of the bill of lading (manifest), plus a copy for the consignee, showing that terminal storage point as the origin of the shipment and specifying the consignee and destination.

"40. Tank truck loads do not average in excess of 5,000 gallons (119 barrels).

"41. When the tank truck or tank car is loaded, this is the first point in time that the ownership of any of the petroleum products in common storage is identified and is the first point in time that any definite kind or quantity of product is designated to a definite consignee at a definite destination.

"42. The shipments by tank truck and railroad tank car are under tariffs and bills of lading completely separate and distinct from plaintiff's tariffs and shipping papers.

"43. The plaintiff received a flat five cents (5¢) per barrel for billing and loading tank trucks and tank cars and this flat rate of five cents (5¢) per barrel was in addition to the transportation rate which the shipper paid and which varies with the distance between the refinery originating point and the various terminal destination storage points.

"44. The plaintiff's invoices to shippers provide separately for the charges for (a) Transportation and (b) Loading. (Exhibit O—Form 52–3)

"45. By letter ruling dated June 1, 1949 to the plaintiff, the office of the Commissioner of Internal Revenue allocated one-half of the five cents (5¢) a barrel revenue to the clerical work of preparing and filling out the bills of lading (and not subject to the tax on transportation of oil by pipe line) and one-half to the loading process, to which it considered applicable the tax at issue here on the transportation of oil by pipe line.

"46. There are two general types of tanks in use on the pipe line system. One type are the line tanks which are used

in operating the pipe line. Where capacity of incoming and outgoing trunk lines are not the same, line tanks are used to make up the increase or decrease as required. The other type of tanks are the storage tanks which are used for the storage of products which have been consigned to the terminal storage point and are connected to the truck and tank car loading racks.

"47. The consignees are assessed for ad valorem taxes on their proportionate share of the petroleum stocks in the terminal storage tanks (but not in line tanks) on the respective property assessment dates at the Minneapolis, Mankato, and Alexandria, Minnesota terminals (State of Minnesota v. Continental Oil Co. et al., 218 Minn. 123 [15 N.W.2d 542], involving the plaintiff's Minneapolis terminal); the Des Moines, Iowa City, and Sioux City, Iowa terminals; the Watertown and Sioux Falls, South Dakota terminals; and the Doniphan, Nebraska terminal.

"48. Shippers occasionally order reconsignments from one consigned terminal storage destination to another.

"49. Consignees may authorize others to withdraw products from their share of the common storage by issuing Authorizations (Exhibit P—Form 294). This Form designates the company authorized to issue loading orders which will be charged against the available product of the consignee. The Form may authorize withdrawal of unlimited quantities of a product or products, or it may specify limited quantities, and may also provide an expiration date beyond which the authorization is invalid.

"50. Consignees may commence withdrawals from a terminal storage point immediately upon acceptance by the plaintiff of a shipment at the shipper's refinery originating point.

"51. The terminal destination storage points are located in or near the major marketing and distribution centers of the area served by the plaintiff's pipe line system.

"52. The amount of transportation tax at issue is $340,461.05 plus interest as allowed by law."

## ADDITIONAL FACTS PROVED

The written tariffs of plaintiff Great Lakes, in force during the period from January 1, 1952 to July 1, 1957 (Exhibits Q–1 to Q–18 inclusive, except Q–13) specified the rates charged in cents per barrel for transportation of Gasoline, Petroleum, fuel oil and distillate by the pipe line of the plaintiff Great Lakes.[1] "General Rules and Regulations" in the tariffs prescribed the "Regulations and Conditions" under which products would be received, transported, delivered and billed.

Throughout the period in question the tariffs provided uniformly for a charge of five cents per barrel in addition to transportation charges for "loading and billing shipments". This provision appears in Items No. 90 and 90A of the applicable tariffs in the following language:

"In addition to the transportation and all other lawful charges provided herein, a charge of five cents a barrel will be made for services performed for shipper of loading, billing and clerical work incident thereto and to the forwarding of shipments in railroad tank cars and motor tank trucks from terminal point to designated destinations."

This charge of five cents per barrel did not include the service of injecting tetraethyl lead, dye, and other additives at the order of the shipper at the delivery terminal. These operations were known as blending and dyeing and were performed without charge, when authorized, except for the payment by the shipper of the cost of the materials and special equipment used. The billing and loading charge was the same whether or not

1. Exhibit Q–19 effective November 20, 1957, cancelled Exhibit Q–18. The I.C.C. numbers of Exhibits Q to Q–18 are Nos. 172; 175; Supps. 1 to 5 to No. 175; 181; Supps. 1 and 2 to 181; 189; 193; 197; 198; 204; 205; 208; 212 and 215. Except for the supplements, each of these tariffs cancelled the next preceding lower numbered tariff.

blending and dyeing service was performed. (During the period in question plaintiff discontinued injection of tetraethyl lead at any terminal other than the Kansas City, Kansas terminal (Item 85, Ex. Q–2, I.C.C. No. 175).

The operations of Great Lakes in question are typified by the operation of the Minneapolis terminal. (Shown on a pictorial representation, Exhibit R.)

## LOADING SERVICES

At Minneapolis the three pipelines carrying incoming liquid products emerge from the ground and enter the manifold building, a unit of the terminal. In this manifold building there is a movable piping arrangement which permits the diversion of the incoming product arriving by any of the trunk pipelines into any of the several aboveground storage tanks in the tank farm at the terminal. The terminal superintendent selects the tank into which the incoming product is transported for storage.

At the terminal is a facility known as a "loading rack", at which railroad tank cars and motor tank trucks are loading as directed by the shipper.

Loading of the product is controlled from the loading rack by an employee known as a "loader". With the system of controls at the loading rack, the loader selects the storage tank from which the product is to be loaded and causes it to move from the storage tank to the loading rack and into the tank car or tank truck, by use of small pumps of 30 to 75 horsepower, insufficient for trunk line movement. (The pipeline pumps which move the product underground across country are generally much more powerful, ranging from 800 to 1000 horsepower.)

The whole Minneapolis terminal on which the tank farm and other facilities are located, covers a tract of 160 acres. (It is the largest of the terminals in question.)

In loading, the products are moved from the storage tanks to the loading racks, a distance ranging from a minimum of 200 feet to a maximum of 2500 feet, depending on the storage tank from which the loading is done. All loading movements take place on the terminal property.

Sometimes weeks intervene between the date of delivery by pipeline to the terminal storage tanks and the loading process from the storage tanks to tank cars and tank trucks.

The relevant tariffs specify that compensation is to be paid for loading services in a combined charge for billing and loading.

## BLENDING AND DYEING SERVICES

In some cases during seasonal changes, gasolines may be moved from one storage tank on the terminal into another to blend the products into a suitable product for the new season. At times, the blending service may be furnished to a shipper to provide a blended product of an octane rating prescribed by a shipper. Other similar blending operations are performed at the request of shippers. No charge was made for this service under the relevant tariffs.

Similarly, blending of fuels occurs at the loading rack in cases where there is no demand for large quantities of the particular blend. This is accomplished by loading two or more specified products in specified quantities directly into the tank truck or tank car.

As noted earlier, additives and dyes may be injected at the terminal. The service is performed without charge for the injection. The only charges in this connection are for materials and special equipment for injecting additives and dyes.

## BILLING SERVICES

Because of the fungible nature of the products, because the necessity of loading according to written instructions, because of the necessity for preparing bills of lading, because of the necessity of maintaining records of shippers' orders, of deliveries, and of accounts for the inventory to the shippers, because of the necessity of collecting for the shipper on C.O.D. orders, and for billing and mailing on other orders, and because of rendition of other clerical services, the plain-

tiff Great Lakes specifies in the tariffs that it is to be compensated for billing services in the combined billing and loading charge. (The complex records, accounts, and clerical operations are illustrated in part by Exhibits C, D, I, J, K, L, M, N, O, and P, forms used in the loading and billing operations.)

## COMBINED BILLING AND LOADING CHARGES

In the relevant tariffs and accounts of Great Lakes, no separate charge or accounting is specified or made for billing on the one hand, or loading on the other. Both are charged and collected in one undivided charge of five cents per barrel in accordance with the relevant tariffs.

## THE COMMISSIONER'S SEGREGATION OF THE BILLING AND LOADING CHARGES

By letter ruling of June 1, 1949, the Commissioner of Internal Revenue determined that one-half of the five cent per barrel is attributable to the loading serv-

ice (Stip. par. 45). Plaintiff has not proved by a preponderance of the evidence that this determination is erroneous. Therefore it is found to be correct.[2]

## STATUTORY HISTORY AND REGULATIONS

In defense of this claim for refund, the defendant relies on the statutes quoted above and Treasury Regulations 42, Sections 130.20, 130.21, and 130.22.[3]

In Section 130.20, supra, the statutory history of the tax is mentioned. Some additional history is helpful in construing the statutes involved.

Section 3460 of I.R.C.1939 became effective March 1, 1939. It contained no exemptions similar to Section 3460(c) involved here.

On June 6, 1939, the Court of Appeals for the Fifth Circuit held that movements from storage tanks on the premises of a refinery to tank cars, tank trucks, and tank ships were taxable. McKeever v. Fontenot, (C.A. 5) 104 F.2d 326.[4]

2. In August, 1950, the Acting Director of the Bureau of Accounts and Cost Finding, Interstate Commerce Commission, ordered the plaintiff Great Lakes to cease reporting billing and loading revenue in the account entitled "Transportation Revenue". (Exhibit 5) This order of the Interstate Commerce Commission would not in any way control or influence the result in this case, and is not considered in deciding this case.

3. "SEC. 130.20 *Effective Period.*—The tax on the transportation of crude petroleum and liquid products thereof by pipe line was imposed originally by Title V of the Revenue Act of 1932. The applicable provisions of the Revenue Act of 1932 were superseded, effective March 1, 1939, by provisions of the Internal Revenue Code. The rate of tax was increased from 4 per cent to $4\frac{1}{2}$ per cent by section 1650(a), as added by section 210 of the Revenue Act of 1940, effective for a period of five years beginning July 1, 1940. The tax at such increased rate was made permanent by amendment of section 3460(a) by section 502 of the Revenue Act of 1941."

"SEC. 130.21 *Scope of Tax.*—Section 3460, as amended by section 502 of the Revenue Act of 1941, imposed a tax on all transportation of crude petroleum and liquid products thereof by pipe line.

"The tax applies to any movement of the specified products by pipe line by any person regardless of whether the movement is for hire. The ownership of the pipe-line facilities, or of the product transported, is immaterial. The taxable pipe-line movement of the specified products includes gathering service within the producing field or area, trunk line transportation service, and loading service furnished as part of, or in connection with, a transportation service."

"SEC. 130.22 *Gathering, Trunk Line, and Loading Services.*—* * *

"Trunk line service includes movements of the specified products from the end of gathering lines, or from unloading points such as loading racks or loading wharves, through main or trunk pipe lines to a point of delivery.

"Loading service includes the loading of the specified products into tank cars or tank vessels over loading racks or loading wharves, where such service is performed as part of, or in connection with, transportation service."

4. In that case the facts were stated as follows: "Appellants were the owners of a large refinery at Destrehan, Louisiana, at the time of the movement for which each item of the tax was assessed. The refinery was located on a body of land belonging to the taxpayers, bordering on

Before the McKeever decision unsuccessful efforts had been made to enact a proviso that the tax not apply to movements of less than ten miles "within a refinery, a bulk plant or a terminal". H.R. 5586, introduced April 1939; H.R. 6206, introduced May 5, 1939, omitting terminals, 1st Session, Seventy-Sixth Congress; H.R. 3072, 1st Session, Seventy-Seventh Congress, introduced February 4, 1941, omitting the ten mile test and including terminals.

In 1941 counsel for the Bureau of Internal Revenue ruled that continuity of movement required of an export shipment was broken by blending (or mixing) of petroleum products in shore storage tanks. G.C.M. 22580, C.B. 1941-1, 459.

In October, 1942, the section here involved, Section 3460(c) I.R.C.1939 became law. H.R. 7378, 2d Session, Seventy-Seventh Congress. In both the House and the Senate report, the bill was described as amending the Code by "limiting the meaning of the term 'transportation' and thereby exempting from the tax on transportation of oil by pipeline any movement through lines of pipe within the premises of a refinery, bulk plant, terminal or gasoline plant, if the movement is not a continuation of taxable transportation". C.B. 1942-2, 372, 503, 504, 699.

Following the enactment of Section 3460(c) the Treasury Department added Section 130.26 to its regulations quoted supra. In this connection it should be noted that Sections 130.21 and 130.22 were issued prior to the enactment of Section 3460(c) and should be construed in the light of the effect which Congress intended Section 3460(c) be given.

Furthermore, the decisions in reported cases involving taxes for periods prior to the effective date of Section 3460(c) must be read with the exemptions provided by Section 3460(c) in mind.

## 1942 CHANGES IN REGULATIONS

The decision in this case is complicated by the change in March, 1942, of the regulations promulgated under the Act of 1932. The regulation in force prior to March, 1942, is set forth in the opinion in the McKeever case, 104 Fed.2d 326, l. c. 328. This regulation, Article 26, provided in respect of the loading oper-

the Mississippi River. Petroleum was brought to the refinery in tank vessels or barges, and transferred therefrom to storage tanks located on the premises. Thereafter, it was processed by the refinery, and the finished products were stored on the premises. There were three methods of moving the finished products to market; by tank wagons, by tank cars, and by tank ships or barges on the river. All movements of petroleum or petroleum products into, out of, or within the plant were performed by pumping through a system of pipes connecting the refinery, the tanks, the loading racks for cars and wagons, and the wharf where ships and barges were served. In addition to the function of transportation, whether as a plant facility in connection with the refinery or otherwise, the pipes were sometimes used to blend different grades of petroleum products to meet certain specifications, the different grades being brought together from their respective receptacles at a T or manifold, and forced to flow together in one pipe for a considerable distance into a common receptacle.

"All of the movements on which the tax has been levied were of finished petroleum products from storage tanks to vessels at the wharf. In some instances the blending process, mentioned above, was performed while the movement was in progress. It is conceded that the pipes in question were of the kind and character employed by pipe-line carriers. The tanks from which the products were moved, being thirty-seven in number, were located from 3,600 to 5,500 feet from the wharf. The same pipes were used for movements into and out of the plant, and for petroleum and its finished products." Attention is invited to the facts in that case that the pipes in question were like those employed by pipeline carriers, and that the movements in question from the tank farm to the wharf were of distances ranging from 3600 to 5500 feet. Furthermore, the District Court in the McKeever case found as a fact that the movements taxed were substantially similar to movements which pipeline carriers usually perform for hire.

ation in question, *inter alia*, the following:

"Delivery service such as loading into tank cars by means of loading racks is subject to tax when rendered *as a continuation of or part of a prior taxable service.*" Treasury Regulations, 1932 ed., Art. 26. (Emphasis added)

In March, 1942, new Treasury Regulations were issued containing new provisions including the following in respect of loading services:

"(c) Loading service includes the loading of the specified products into tank cars or tank vessels over loading racks or loading wharves, where such service *is performed as part of, or in connection with transportation service.*" Treasury Regulations, 130.22(c). (Emphasis added)

The words "in connection with" a transportation service also appear for the first time in the definition of the scope of the tax contained in the regulations issued in March, 1942, Section 130.12(a) and (b).

In the defendant's brief no contention is made that this provision narrows the exemption as set forth in the statute Section 3460(c). Any such contention would be unsound.

Another change in the regulations as they existed prior to March, 1942, is the elimination in the regulations of 1942 of the "local or incidental" test. Article 26 of the pre-existing regulations contained this sentence:

"It (taxable transportation) also includes the transportation by a private owner whenever the movement is substantially similar to movements which pipeline carriers usually undertake and perform, *if the movement is not merely local or incidental to another business or a related business engaged in by the person so transporting such as the producing or refining of oil.*" (Emphasis added)

As noted, these changes in the regulations preceded the enactment of the applicable exemption statute, Section 3460 (c), I.R.C.1939. Whatever their meaning may have been (which is not very clear), they must yield to the subsequently expressed Congressional intent, and be subordinated to the operative statute, Section 3460(c).

In determining whether the loading movements in the case at bar are exempt from taxation, the ultimate question is whether Congress intended to tax such movements. Involved in the ultimate question are two questions: (1) Did Congress in enacting the exemption of 3460(c) in 1942 intend to exempt such loading movements; (2) Are such loading movements without the general taxing provisions of Section 3460 prior to the enactment of Section 3460(c)? If either question is answered affirmatively the plaintiffs are entitled to refund of the taxes paid on loading services.

Plaintiff in its submission features the exemption of Section 3460(c), so that the question of the exemption considered alone will be determined first.

### EXEMPTION OF SECTION 3460 I.R.C.1939 and 4283 I.R.C.1954

Section 3460(c) exempts movements "through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant" provided "such movement is not a continuation of a taxable transportation".

In this case it is clearly established that the loading movements in question are "within the premises" of a "terminal" and exempt if the loading movements are not "a continuation of a taxable transportation".

Are the loading movements in this case the "continuation of a taxable transportation"? The conclusion is that they are not. Therefore the loading movements are exempt from the taxation under Section 3460(c).

### REASONS FOR CONCLUSION

The reasons for this conclusion are these: (1) The charge for transportation by pipeline is stated separately in the relevant tariffs; (2) the transportation

charge in the relevant tariffs covers only service in delivering the product by pipeline into the storage tanks at the terminal; (3) the movements involved in loading are accomplished by the use of pipes, conduits, and pumps unsuitable for pipeline transmission; (4) the distance involved in the movements is not great; (5) all movements in question are made on the terminal premises consisting of a 160 acre tract; (6) the loading process occurred after the transportation by pipeline had ceased and after the products carried had been stored at the destination of the shipment; (7) the loading operation is local in character.

None of the foregoing reasons are deemed decisive standing alone, although the decision in Republic Oil Refining Co. v. Granger, (C.A.3) 198 F.2d 161, would permit the question to be decided solely on the spatial consideration, number (5) above.

█ It seems beyond doubt that Congress intended neither the refiner nor the independent pipeline patron to have any competitive advantage because of the imposition of this tax. This rule is implicit in the statutes and explicit in the cases applying it. Republic Oil Co. v. Granger, supra; l. c. 163; Cities Service Oil Co. v. U. S., (S.D.N.Y.) 163 F.Supp. 164, l. c. 167; Southern Minerals Corp. v. U. S., (S.D.Tex.) 150 F.Supp. 646, l. c. 647. See also McKeever v. Fontenot, (C.A.5) 104 F.2d 326, and Magnolia Petroleum Co. v. U. S., (Ct.Claims) 53 F. Supp. 232, 101 Ct.Cl. 1, decided before Section 3460(c) became effective.

In fact the original decision in McKeever v. Fontenot was founded on the Congressional intent that a refiner should not have a tax advantage by virtue of ownership of pipeline facilities.

To hold that the movements in this case are taxable would violate the Congressional intent to levy the tax upon refiners and pipeline patrons alike. This is true because in similar operations refiners have been held to be exempt. Republic Oil Refining Co. v. Granger, (C.A.3) 198 F.2d 161; Pan American Refining Corp. v. U. S., (C.A.5) 219 F.2d 685;

Port Fuel Co., Inc. v. U. S., (S.D.Tex.) 136 F.Supp. 89; Cities Service Oil Co. v. U. S., (S.D.N.Y.) 183 F.Supp. 164. All of these decisions involve taxes sought to be imposed after the enactment of Section 3460(c) in 1942.

Magnolia Petroleum Co. v. U. S., (Ct. Claims) 53 F.Supp. 231, 101 Ct.Cl. 1, relied on by the defendant, involved taxes imposed prior to the enactment of Section 3460(c). This is expressly noted by the Court at page 234 of 53 F.Supp. The case is obviously not in point on the exemption question.

The decision in Richfield Oil Corp. v. U. S., (N.D.Cal.) 175 F.Supp. 200, is in accord with the result reached in this case. It is true that the preceding transportation was by sea and not taxable, while in this case the preceding transportation was by pipeline and taxable. This is a distinction in fact without significance.

The expressions of Judge Roche in that case at page 202 clearly indicate that the lack of taxability of the prior movement was not the basis for the decision in that case. There he said:

"In the instant case the oil arrives by seagoing cargo vessel, not a taxable transportation, and therefore the movements across the 'premises' are literally not a 'continuation of a taxable transportation.' Nor are they within the spirit of the condition; the movements are basically local in character, being an integral part of the storage and loading operation of the terminal, and only incidentally related to transportation."

It would serve no useful purpose to explore analogous concepts in other legal fields which do not bear directly on the statutes in question.

Since it is determined that the loading movements in this case are exempt under Section 3460(c), it will not be necessary to determine whether the loading movements are without the taxing provisions of Section 3460 as it existed before Section 3460(c) was enacted. Certainly there are some important differ-

ences in the case at bar and the McKeever case, supra. But it is not necessary to evaluate these differences.

### CONCLUSIONS OF LAW

The loading movements in the case at bar are exempt from the taxes imposed by Section 3460, I.R.C.1939, and by Section 4281, I.R.C.1954. The exemption exists under the provisions of Section 3460(c), I.R.C.1939, and under Section 4283, I.R.C.1954. Therefore the plaintiff is entitled to recover in this action the sum of $340,461.05 with interest as allowed by law. It is therefore

Ordered that the judgment to be entered herein be settled on notice under Rule 6(c) of this Court.

